JOHN W. PECK, Senior Circuit Judge.
 

 Following a jury trial in the Wayne County [Michigan] Circuit Court, appellant A. David Laudani was found liable for $349,000 in damages for publishing and distributing a libelous document which accused appellees James and Sheila Wheeler of exploiting Mr. Wheeler’s public office of City Councilman for personal benefit. When Laudani subsequently filed bankruptcy, the Wheelers objected to discharge of the libel debt on the basis that the Bankruptcy Code of 1978, 11 U.S.C. § 523(a)(6), prohibits discharge of a debt which results from a willful and malicious injury caused by the debtor to another or his property. The U.S. Bankruptcy Court for the Eastern District of Michigan granted summary judgment for the Wheelers, holding that the libel verdict necessarily encompassed a finding that Laudani acted willfully and maliciously. The United States District Court for the Eastern District of Michigan affirmed. This appeal ensued.
 

 After a thorough review of the record, we reverse the district court and remand this case for proceedings consistent with this opinion.
 

 I
 

 The underlying libel action was based upon a leaflet entitled “Election Alert”
 
 *612
 
 published by Mr. Laudani in November 1979 just prior to the Harper Woods, Michigan city council election in which Mr. Wheeler was running for re-election. It stated:
 

 ELECTION ALERT
 

 Next Tuesday, November 6, we will be electing four councilmen,
 

 KNOW THE TRUTH ABOUT THE CANDIDATES BEFORE YOU VOTE
 

 Two candidates, Councilmen JAMES P. WHEELER and FRED F. SHAENING are not telling the voters that:
 

 1. WHEELER and SHAENING have just raised our city taxes to 19 mils. Compare this with Grosse Pointe Woods city taxes of 13 mils. This means that the city taxes on a home in Harper Woods are 46% higher than those on the same type home in Grosse Pointe Woods (do not confuse this with school taxes which are separate and not under the control of our council). We are now paying higher taxes than Grosse Pointe homeowners, while receiving Detroit type services. Remember last January and February when our streets were clogged with ice and snow while the Grosse Pointe streets were clean and dry.
 

 2. WHEELER and SHAENING have also added a 1% fee on top of our increased taxes as a “Collection Fee” for collecting these taxes.
 

 3. WHEELER and SHAENING embarrass our city by openly bickering at council meetings; the latest outburst between them was at the October 1, 1979 meeting when SHAENING shouted to WHEELER that he is a liar, a cheat and a troublemaker.
 

 4. WHEELER voted to give the city clerk, Elinor Cramer, $2,000.00 extra per year above her regular salary of $23,888.00 to act as public relations director responsible for putting out four newsletters a year. The recreation director, William Johnston, did this before as part of his regular duties, at no extra pay. Grosse Pointe Woods has no city clerk; that job is combined with the city manager’s duties, at no extra pay.
 

 5. WHEELER and SHAENING voted to give a going away dinner party with champagne and wine at taxpayer cost of $558.68 on August 27 & 28, 1978 for previous city manager, Joseph Dorsky, who quit for a better job. We paid for 68 of Dor-sky’s personal friends to attend this party as his guests. The $558.68 was paid to our city clerk, Elinor Cramer who also operates a catering business on the side. If this sounds unbelievable, go the city offices and ask to see Elinor Cramer’s letter dated June 28, 1978 to the council in which she states “The party will be a wine party with buffet dinner catered by
 
 Cramer and Cramer
 
 August 27, 1978 between 5:30 p.m. and 8:30 p.m. in the Council Chambers. On Monday August 28,1978 between 4:00 p.m. and 5:30 p.m. in the Council Chambers will be a wine and hors d’oeuvres party for all City employees.”
 

 6. WHEELER made reservations for a private party on May 20,1979 at the Flying Machine (a local bar and restaurant) for his friends and visiting politicians at taxpayers cost of $307.50.
 

 7. WHEELER and SHAENING hired a young man, named Ronald Bultman, only 29 years old, and with little experience, as our new city manager at a salary of $31,-175.00 plus $2,100.00 to drive his car plus $2,000.00 in fringe benefits. They have just given him a raise of over 16% to $36,-350.00 plus the $4,000.00 worth of fringe benefits for a total of over $40,000.00 per year. All this for a man who knew so little about the job only 10 months ago that they had to send him to school in Ann Arbor, at taxpayer cost of over $500.00 to learn how to be a city manager.
 

 8. WHEELER, who is head of the local Jaycee chapter, invited 53 friends to the Jaycee awards banquet in the Harper Woods Community Center on May 21, 1979 at taxpayer cost of $530.00.
 

 9. WHEELER had the city pay his Jaycee friends $180.00 to distribute political literature to Harper Woods homes.
 

 
 *613
 
 10. WHEELER voted to give his good friend and fellow Jaycee member, Judge Roger J. LaRose a total of $42,000.00 per year plus $4,000.00 worth of fringe benefits such as Blue Cross, life insurance, dental insurance and Bar Association dues. ALL THIS FOR ONLY 20 HOURS WORK A WEEK! This is the highest pay for any judge in this area. Grosse Pointe judge receive $6,000.00 and pay for their own fringe benefits and Bar dues. In fact, even the higher Circuit Court judges downtown pay for their own Bar dues.
 

 11. WHEELER’S friend Judge Roger J. LaRose has pushed up our court operating costs from $67,584.00 in 1978 to more than double that amount, $136,596.00 in 1979.
 

 12. WHEELER has voted to spend $800.00 to appraise the mirror factory offices on Harper, across from the City Hall and is prepared to spend $250,000.00 more of our taxes to turn the offices into a court for his friend, Judge Roger J. LaRose.
 

 13. WHEELER has managed to have his wife, Sheila, hired as an art teacher in the Harper Woods schools (Tyrone Elementary) while more qualified teachers are laid off.
 

 14. WHEELER voted to pay a friend of his $7,000.00 for a feasability study and $1,400.00 for a survey of the proposed senior citizen housing project even though the public has filed petitions for a referendum vote and the building cannot be financed until the people decide if they want it.
 

 15. WHEELER is still pushing for senior citizen housing, despite the fact that it would require $100,000.00 of our taxes every year to help pay for it and at $350.00 monthly rent, plus gas and electric, our senior citizens cannot afford to live in it.
 

 16. WHEELER has voted to increase ambulance use charges to Harper Woods residents from $20.00 to $50.00 for each trip to the hospital.
 

 17. WHEELER has proposed that all community groups, including our senior citizens, be charged a rental fee for use of our Community Center, except for his own Jaycees who would continue to use it free.
 

 18. WHEELER and SHAENING are ready to start charging us about $15.00 per month, after the election, to collect our garbage and to put that charge on our water bills. This is their way to get around the Headlee Tax Limitation Amendment.
 

 19. WHEELER took his wife to a convention in Mackinac Island last summer at a cost to the taxpayer of $390.00.
 

 20. SHAENING never misses a chance to travel at public expense and to take his wife, Virginia, with him. Some of his trips we have paid for were to: Boston, St. Louis, Dallas, Washington, Mackinac Island, Chicago, Milwaukee, Lansing, Grand Rapids and San Francisco. For the San Francisco trip, so many couneilmen went there were not enough of them left here to hold their December, 1977 meeting, which had to be cancelled.
 

 21. WHEELER and SHAENING have made reservations to attend a convention in Las Vegas in November, along with their wives.
 
 If they are elected next Tuesday, they will celebrate their victory in Las Vegas at our expense.
 

 Do not let JAMES P. WHEELER’S boyish grin fool you. He is arrogant, rude, curt and hostile to any citizen who wants to speak or question his actions at council meetings. He and his wife, Sheila, take every opportunity to exploit his position as a councilman by pushing their weight around and demanding favorable treatment throughout our city.
 

 JAMES P. WHEELER has been
 
 WHEELING AND DEALING
 
 with our tax dollars to benefit himself, his relatives, his friends and his supporters.
 

 HARPER WOODS DOES NOT NEED A WHEELER DEALER TO RUN OUR GOVERNMENT
 

 WHEELER with some of his fellow coun-eilmen have lost touch with the public and have forgotten that we are the ones who actually pay the bills with our hard earned money. With all that wild spending for parties and inflated salaries, it is little won
 
 *614
 
 der why our councilmen keep raising our taxes right up through the ceiling!
 

 THOSE WHO ABUSE OUR TRUST DO NOT DESERVE OUR VOTE
 

 Tell our council your feelings about their spending at their regular meeting this Monday....
 

 On the basis of this document the Wheelers filed an action for libel against Laudani in the Wayne County Circuit Court alleging in relevant part that:
 

 ... “Election Alert” ... was composed, printed, published and distributed by defendants ... willfully, maliciously, wantonly, recklessly and in utter disregard of the truth, knowing that the words complained of were false or with reckless disregard as to whether or not they were false....
 

 After a lengthy trial, the jury returned a general verdict finding Laudani guilty of libel and awarded $300,000 to Mr. Wheeler and $45,000 to Mrs. Wheeler. The record reflects that the jury instructions stated as follows:
 

 It is the theory of the Plaintiffs that Mr. LAUDANI, in order to harm and defeat those who had investigated his actions as municipal judge and who had supported Judge LaRose, did the following.
 

 a. He wrote the Election Alert, deliberately writing it in such a way as to do the maximum injury to the reputations of the WHEELERS.
 

 b. He wrote information which, by its detail and thus apparent authenticity, would do lasting damage.
 

 c. He wrote the entire Election Alert in such a way as to give the appearance of being factual, not just opinion.
 

 d. He distributed it deliberately at the last possible moment before the election, so that there would be no time to do the research necessary to rebut the allegations.
 

 e. He distributed it deliberately all over the City of Harper Woods.
 

 f. He knew when he wrote it that some of the items were definitely not true. He knew that others were only half-truths. And about still others he either had substantial doubts as to the truthfulness, or he wrote in reckless disregard as to whether the items were true or not.
 

 g. Both in order to cover up his authorship and to give it more apparent authenticity, he had Mrs. PAGANO form the Harper Woods Home Owners Association, so that the material would either be confused with other home owner groups of long standing, or would at least give the appearance of having been put out by a group of people.
 

 h. When a demand for retraction was sent him, pointing out that what he had said was false, he ignored it, thus compounding the harm he had done.
 

 In granting the Wheelers’ motion for summary judgment, the bankruptcy court stated that “[l]ibel is an intentional tort based upon a willful and malicious injury.... It suffices that this court finds that the verdict of the Wayne County Circuit Court, finding Defendant liable for defamation, encompassed within it a finding that Defendant-Debtor willfully and maliciously injured Plaintiffs. Since Defendant willfully and maliciously injured Plaintiffs, the debt ... is nondischarge-able_” Joint Appendix at 11. In its formal opinion the bankruptcy court recognized that “a wrongful act done intentionally which necessarily produces a harm and is without just cause or excuse may constitute a willful and malicious injury” for purposes of the Bankruptcy Act.
 
 In re Laudani,
 
 38 B.R. 632, 634-35 (Bankr.E.D.Mich.1984), citing
 
 Tinker v. Colwell,
 
 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904); 3
 
 Collier on Bankruptcy,
 
 ¶ 523.16 at 523-129 (15th ed. 1985). The bankruptcy court concluded that there was no disparity between this standard of willful and malicious conduct and the standard considered by the jury.
 
 Laudani,
 
 38 B.R. at 636.
 

 
 *615
 
 II
 

 In an action for libel involving a public figure, as is Wheeler by virtue of his office, the plaintiff must prove that the defendant acted with “actual malice.”
 
 Postill v. Booth Newspapers, Inc.,
 
 118 Mich.App. 608, 619, 325 N.W.2d 511, 516 (1982). Michigan courts follow the definition of “actual malice” set forth in
 
 New York Times v. Sullivan,
 
 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964): “knowledge that [the statement] was false or with reckless disregard of whether it was false or not.”
 
 See Schultz v. Newsweek, Inc.,
 
 668 F.2d 911, 918 (6th Cir.1982);
 
 Postill,
 
 118 Mich.App. at 619, 325 N.W.2d at 516. Thus, a libel verdict may be based on reckless conduct.
 

 Under § 523(a)(6) of the Bankruptcy Code “willful means deliberate or intentional.” S.Rept. No. 95-989, 95th Cong. 2d Sess. (1978) reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5865; H.Rept. No. 95-595, 95th Cong. 1st Sess. (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6320. “Malicious” means in conscious disregard of one’s duties or without just cause or excuse; it does not require ill-will or specific intent to do harm.
 
 Tinker,
 
 193 U.S. at 486, 24 S.Ct. at 508;
 
 In re Voltolini,
 
 48 B.R. 199, 201 (Bankr.D.Mass.1985);
 
 In re Capparelli,
 
 33 B.R. 360, 365 (Bankr.S.D.N.Y.1983);
 
 In re Klix,
 
 7 C.B.C.2d 276, 279, 23 B.R. 187 (Bankr.E.D.Mich.1982). The intentional tort of libel meets the requirements of § 523(a)(6) for non-dischargeability when the debtor/author knows the published statements were false.
 
 In re Kasler,
 
 611 F.2d 308, 310, 311 (9th Cir.1979). Mere reckless disregard for the truth or falsity of the statement, which can support a libel verdict, is not a willful and malicious injury for purposes of § 523(a)(6).
 
 Id.; In re Pereira,
 
 44 B.R. 248 (Bankr.D.Mass.1984). Laudani contends that a genuine issue of material fact exists as to whether the jury based its verdict upon a finding that Laudani recklessly disregarded the truth or upon a finding that he knew his statements were false; only the latter would prevent discharge of the debt.
 

 We conclude that the case was not in proper posture for summary judgment. The libel complaint itself pleaded in the alternative that Laudani published “Election Alert” either with knowledge of its falsity
 
 or
 
 in reckless disregard of whether it was false. Similarly, paragraph (f) of the jury charge quoted above stated plaintiffs theory that Laudani wrote “Election Alert” with knowledge of its falsity
 
 and
 
 in reckless disregard of the truth of some items. Moreover, neither party has sought to “flesh out” the record by identifying how and which claimed items of falsity were or were not established at trial. Because the jury's verdict was general, it is impossible on the current state of the record to divine whether the jury verdict rested on a finding that Laudani acted knowingly or merely recklessly. Accordingly, genuine issues of material fact exist which render this case in its current posture inappropriate for summary judgment.
 

 While not basing its decision on the doctrine of collateral estoppel, the bankruptcy court also expressly found that Lau-dani would be barred under collateral estoppel principles, as set forth in
 
 Spilman v. Harley,
 
 656 F.2d 224 (6th Cir.1981), from relitigating the willful and malicious nature of the debt because the court found that the issue of willfulness and maliciousness had been raised and actually litigated in the state court libel proceeding and was necessary to its outcome.
 
 Laudani,
 
 38 B.R. at 635-636. As stated above, neither the pleadings nor the general verdict reflects that the issue of willfulness and maliciousness was actually litigated and necessary to the verdict. Thus, based on the record at hand, collateral estoppel would not operate to bar relitigation of this issue.
 

 The judgment of the district court is therefore reversed. The case is remanded with directions to the bankruptcy court to obtain the entire trial court transcript and
 
 *616
 
 to review the record
 
 [1]
 
 for a determination of whether the jury verdict and judgment encompassed a finding that Laudani acted willfully and maliciously in that he knew the published statements were false.
 

 [1]
 

 . Although we recognize that
 
 de novo
 
 review of the record is cumbersome no viable alternative is apparent, and such review is consistent with previous holdings of this court,
 
 see Spilman,
 
 656 F.2d at 229, and other authorities,
 
 see e.g. Pereira,
 
 44 B.R. at 252; 3
 
 Collier on Bankruptcy
 
 ¶ 523.16 at 523-125 (15th ed. 1985).